**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**ROBERT EARL SIMMONS, JR.**                                                    **PLAINTIFF**


**v.**                                          **CIVIL ACTION NO. 1:18-CV-185-MPM-RP**


**MONROE COUNTY, MISSISSIPPI**                                            **DEFENDANT**


## ORDER

This cause comes before the court on the motion of defendant Monroe County,

Mississippi for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Robert Earl

Simmons has responded in opposition to the motion, and the court, having considered the

memoranda and submissions of the parties, concludes that the motion should be granted in part

and denied in part.

This is, *inter alia*, a disability, race and sex discrimination case arising out of plaintiff's

brief employment at the Monroe County Jail ("the jail"). Plaintiff is a black male who worked as

a jailer for less than two months in late 2017 and early 2018. Plaintiff started work on December

21, 2017, and he alleges that, soon afterwards, he began complaining of an aggravation of his

previously dormant asthma condition, which he asserted was caused by smoking at the jail.

Plaintiff contends that, notwithstanding the fact that a no-smoking policy already existed at the

jail, defendant refused his request that the policy be enforced. Plaintiff contends that, as a result

of the aggravation of his asthma, he was repeatedly forced to miss work and to seek medical

attention. Plaintiff further alleges that, during his employment, he suffered a completely separate

form of unlawful treatment, in the form of racial and sexual harassment by a co-worker. In

particular, plaintiff alleges that Steve Hankins, a co-worker, repeatedly called him a "faggot" and "Steve Urkel the black nerd" and that jail administrators refused to address this harassment.

Defendant notes that, during his brief employment, plaintiff missed more than ninety-one hours of work, and it contends that this fact ultimately led to his termination. On February 7, 2018, Jail Administrator Scotty Clark, and Chief Deputy Curtis Knight, informed plaintiff that he was being terminated due to his excessive absenteeism.[1]  Feeling aggrieved, Simmons filed two charges of discrimination with the EEOC, one on February 8, 2018, and one on February 14, 2018, claiming race, sex, and disability discrimination and retaliation. The EEOC mailed plaintiff right to sue letters for both charges on July 31, 2018, and plaintiff filed a Complaint in this court on October 2, 2018. Defendant has presently moved for summary judgment, arguing that no genuine issue of fact exists regarding its potential liability in this case and that it is entitled to judgment as a matter of law.

This court considers first defendant's motion to dismiss plaintiff's claims under the Americans With Disabilities Act (ADA). In seeking dismissal of these claims, defendant relies primarily upon an argument that plaintiff has failed to present adequate proof that he suffered from a "disability" within the meaning of the Act. In setting forth this argument, defendant faces very considerable legal headwinds, since 2008 revisions set forth in the ADA Amendments Act (ADAAA) make it exceedingly easy for plaintiffs to demonstrate that they are "disabled" within the meaning of the Act. Prior to the enactment of the ADAAA, much of the litigation under the ADA dealt with the issue of whether a particular plaintiff was "disabled" for purposes of the ADA. However, Congress made it clear in the ADAAA that "the definition of disability … shall

---

[1] The parties agree that Simmons was given the opportunity to resign instead, which he accepted. Defendant nevertheless writes in its brief that plaintiff was "fired," [Defendant's brief at 1], but plaintiff's brief characterizes his removal as being "forced to resign."  [Plaintiff's brief at 7].  For the sake of simplicity, this opinion will refer to his termination as a "firing."

be construed in favor of broad coverage of individuals … to the maximum extent permitted." 42 U.S.C. §12102(4)(A). Moreover, while a plaintiff is still required to demonstrate an "impairment that substantially limits one or more major life activities of such individual," the ADA, as amended, makes it clear that the "term 'major' shall not be interpreted strictly to create a demanding standard for disability." 29 C.F.R. § 1630.2(i)(2).

In the court's view, perhaps the most significant amendment to the ADA involves the relaxing of the requirements as to whether an individual is "regarded" as having a disability under the ADA. This "regarded as" provision is the third prong of the ADA, which defines a disability as either: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Miller v. McHugh*, 814 F. Supp. 2d 299, 312 (S.D. N.Y. 2011). One commentator has noted the significance of the amendments to the "regarded as" prong, writing that:

> Under the third "regarded as" prong, a person does not need to have a disability to be covered if the employer discriminated against a person for having an actual or perceived physical or mental impairment. Under the pre-ADAAA law, plaintiffs had to prove that the employer thought that the plaintiff met every element of disability for purposes of the ADA. . . . Suffice to say, the ADAAA makes the "regarded as" prong not only easier to understand and prove, but will potentially mean that "regarded as" liability will play a much larger role in future ADA litigation.

Jeffrey M. Hirsch, Mastering Employment Discrimination Law, § 12.1. It is thus apparent that the ADAAA was specifically enacted to lessen the plaintiff's burden of proof on multiple prongs of the Act's "disability" requirement. Without question, this fact makes defendant's burden in seeking summary judgment far more onerous than it would have been under the original ADA.

In the court's view, defendant's attempts to persuade it to grant summary judgment on the issue of "disability," notwithstanding the enactment of the ADAAA, is made even more

difficult by weaknesses in the authority it cites. In its brief, defendant cites the recent decision of *Jackson v. Oil-Dri Corporation of America*, 2018 WL 1996474, at *6 (N.D. Miss. 2018), as an example of a case where, even after the enactment of the ADAAA, a district court granted summary judgment based upon inadequate proof of a disability. In its briefing, however, defendant did not mention the fact that the dismissal was appealed to the Fifth Circuit, which "assume[d] without deciding that a reasonable jury could conclude that Jackson has a disability under the ADA." *Jackson v. Blue Mountain Production Company*, 761 Fed.Appx. 356, 360 (5th. Cir. 2019). The Fifth Circuit instead affirmed the district court's ruling on a completely separate issue, namely based on a finding that the employer had made reasonable accommodations for the plaintiff's disability. *Id.*

Thus, far from reassuring this court that it might validly grant summary judgment on the "disability" prong notwithstanding the enactment of the ADAAA, *Jackson* actually reinforces its hesitance to do so. Clearly, the Fifth Circuit in *Jackson* was well aware of the multiple lenient options granted by the ADAAA for plaintiffs to prove an actual or perceived disability, and it appears that it was very much reluctant to conclude as a matter of law that none of those options might be viable in that case. This court has a similar reluctance in this case, even though it does acknowledge that (as in *Jackson*), Simmons' proof of disability is far from compelling here.

At the summary judgment stage, this court is required to view the facts in the light most favorable to plaintiff, as the non-moving party. Considered in this light, this court will note some of the facts which, in its view, support allowing a jury to determine whether plaintiff has met one of the very lenient options for establishing an actual or perceived disability under the ADAAA. In his deposition, plaintiff testified that he complained to jail administrator Scott Clark on multiple occasions about the smoking at work. Specifically, plaintiff testified that:

A. This happened several times. And I went to Mr. Scotty Clark and told him about it. And he was like, well, who was smoking in my tower? And I told him who was doing it. Then he said, well, I'm going to talk to them about it. And I haven't heard anything else on it.
Q. So you don't know if he talked to them or not?
A. No.
Q. But you're not saying he didn't talk to them.
A. I'm not for sure.
Q. Okay. So you think -- you said several times somebody was smoking in the tower and you were there. Are you saying like two?
A. Probably about at least four or five.

[Depo. at 28].

In his deposition, plaintiff specifically testified that he presented his employer with doctor's excuses from work, and defendant does not dispute that this occurred. Moreover, while plaintiff conceded that these medical forms did not specifically state that he suffered from asthma, he insists that he told his employer that he did, in fact, suffer from the condition:

A. No. Well, actually, it was like doctor's excuses that I got from the doctor's office.
Q. But a doctor's excuse doesn't tell your employer what is wrong with you, does it?
A. No. Well, I was telling them about the asthma, then I gave them a medical record showing where I had asthma and what caused the asthma. Now, he does have medical record on that.

[Depo. at 30]. For its part, defendant denies that plaintiff told it that he suffered from asthma, and, if a jury concludes that plaintiff is lying on this issue, then this will likely be fatal to his ADA claims. At this juncture, however, this court is required to view the facts in the light most favorable to plaintiff, as the non-moving party, and, that being the case, it can not simply assume that he is lying on this issue.

In his brief, plaintiff describes his efforts to have defendant accommodate his disability as follows:

After seeing Dr. Monroe, Simmons brought the doctor's excuse to his boss, the jail administrator, Scotty Clark. When Simmons did, he told Scotty Clark about how the smoking was reactivating his asthma. Simmons also gave Clark medical records that showed he was being treated for asthma by Dr. Monroe. Scotty Clark never provided

5

Simmons the reasonable accommodation of enforcing the jail policy concerning tobacco and stopping Smith and Livingston from smoking in the tower. Simmons also requested another reasonable accommodation of moving to another shift where he would not be around the smoke, but that was denied that as well.

On February 7, 2018, Simmons was called into the office by Scotty Clark with Tyler Stanford present. Simmons gave Scotty Clark a copy of his medical report from Merit Health the previous day where he was treated for an upper respiratory infection, which obviously affected his breathing. According to Simmons, when he first got to the office:

> [Clark] told me that he was mad that I wasn't there because I was going to the doctor back and forth. And I told him that the smoke was making me sick and that's the reason I had to take off. And if it wasn't for that . . . I wouldn't have to take off every day. And he kind of got angry, upset and was like, well, you ought to be here.

[Plaintiff's brief at 7 (record citations omitted).] As discussed below, this court agrees with plaintiff that defendant's reliance upon his excessive absences is problematic as a defense to an ADA claim which is itself based upon the notion that a failure to accommodate his disability was making him sick, and thus miss work.

This court notes that some support for plaintiff's claim can be found in the deposition of his treating physician Dr. Monroe. In his deposition, Dr. Monroe testified that, while he personally did not diagnose Simmons with asthma, plaintiff told him that he suffered from the condition and that he accepted his claim at face value:

> Q. So when you saw this patient in 2016, … I believe you saw him approximately three times. Did you ever, according to these records, diagnose him with asthma?
> A. If I remember correctly, I did not -- other than he made the statement he had asthma and I trusted his explanation. When patients come in and they say, I've got a problem, I believe that's what they got, a problem, and I'll treat them according to that. If I remember correctly, I did not see anything or hear anything specifically that gave me an idea that he had it, but that doesn't mean anything. When a patient comes in and they've got symptoms, that's one thing. When they come in and they said they had symptoms, that's another thing. But they're still basically treated the same way.

[Dr. Monroe Depo. at 8].

While Dr. Monroe's testimony is unhelpful to plaintiff's claim that he actually suffered from asthma (but does not directly contradict it), it does tend to support his assertion that he told

his employer that he suffered from the condition and was therefore "regarded as" having asthma within the meaning of the ADAAA.  That is, the fact that plaintiff made contemporaneous complaints of suffering from asthma to his doctor makes it considerably more likely, in this court's view, that he testified truthfully that he made the same assertion to his employer.  Furthermore, the undisputed fact that plaintiff repeatedly presented his employer with doctor's excuses from work may make a jury more likely to believe his testimony on this issue, even if the excuses did not specifically state that asthma was the reason for the absences.  Clearly, these medical certificates suggested that there was *some* medical basis for plaintiff's absences, and a jury may regard it as plausible that plaintiff specifically told his employer about the exact medical reason he was missing work.  Indeed, a jury may regard it as likely that, in light of his repeated medical absences, there would have been at least some discussion between plaintiff and his employer regarding exactly what the medical reason for his absences was and how long they were expected to continue.  If a jury so concludes, then it may regard it as plausible that plaintiff would have told his employer the same thing he told his doctor, namely that he suffered from asthma.

This court wishes to be clear that it does not regard the above evidence as constituting, by any means, strong proof that plaintiff suffers from a disability.  Indeed, if this court were considering this issue under the original version of the ADA, then a dismissal on summary judgment would very likely be in order.  Defendant's problem is that it is seeking dismissal under an ADAAA in which Congress made a conscious decision to move away from litigation regarding the disability issue as a basis for deciding most ADA claims.  In particular, the fact that Congress greatly relaxed the plaintiff's burden of showing that his employer *regarded* him as disabled, even if he was not actually disabled, makes it very difficult for defendant to secure

summary judgment on this issue.  In light of the 2008 amendments to the Act, it seems fair to regard the current disability standard under the ADA as one of the most plaintiff-friendly standards in all of federal civil litigation.

Not only is defendant seeking for this court to rule in its favor on this plaintiff-friendly standard, but it is asking for it to do so in the context of a summary judgment motion in which it is required to view the facts in the light most favorable to plaintiff, as the non-moving party.  It does not help that, in seeking for this court to do so, defendant relies upon a *Jackson* decision in which the Fifth Circuit assumed on appeal that the plaintiff was, in fact, disabled under the ADAAA.  Plaintiff insists that he told Clark that asthma was the specific medical reason behind his absences, and, that being the case, this court is not in a position to simply assume he is lying. Assuming that plaintiff testified truthfully in this regard, it strikes this court that he has a reasonable argument that his employer regarded him as suffering from a disability under the ADAAA.  In its motion, defendant relies upon the affidavits of multiple jail employees that plaintiff never told them about his asthma, but it strikes this court that this issue largely involves the relative credibility of plaintiff and Clark.[2]  Credibility assessments of this nature are for a jury to make.  This court therefore concludes that triable fact issues exist regarding whether plaintiff can establish that he met at least one of the definitions for "disability" under the ADAAA.

This court concludes that fact issues exist regarding the remaining elements of plaintiff's ADA claims as well.  With respect to the issue of reasonable accommodation, this court regards plaintiff's evidence that the Monroe County jail had a no-smoking policy as being an indication

---

[2] As discussed below, there are potential credibility issues with regard to both of these witnesses. Clark, for example, testified that he did not investigate plaintiff's claims of harassment because he had resigned, but, as noted previously, defendant now concedes that plaintiff was actually fired.

that, in allegedly asking defendant to simply enforce a pre-existing policy, he was seeking a very "reasonable" accommodation indeed. In its briefing, defendant concentrates on the second accommodation which plaintiff allegedly requested, namely to be transferred to a different department at the jail. Defendant notes that, in his deposition, plaintiff indicated that this request was made for non-health reasons, and this court agrees that this testimony serves to cast significant doubt upon this second alleged accommodation basis. Even assuming that plaintiff only sought to have defendant's non-smoking policy enforced, however, then this would, in the court's view, constitute a legally cognizable accommodation request under the ADA.[3]

A similar analysis applies to defendant's claim that plaintiff was "unqualified" for his position due to his inability to show up for work. Plaintiff maintains that he would, in fact, have been able to show up for work if he had been offered the reasonable accommodation of having the jail enforce its existing anti-smoking policies. This strikes this court as being a reasonable summary judgment argument, and it therefore concludes that genuine fact issues exist with regard to this issue as well. Plaintiff's arguments in this context likewise serve to cast doubt upon defendant's stated reason for firing him, namely his excessive absences. Once again, plaintiff's basic point is that his workplace was making him sick. If defendant had granted plaintiff his request that the non-smoking policy at the jail be enforced, and he had continued to miss an excessive amount of work, then it might well have a compelling summary judgment argument that it had a valid reason for firing him. As the facts currently stand, however, this court is not prepared to rule, as a matter of law, that plaintiff's health-related absences serve to

_____

[3] Defendant has filed a motion to strike an affidavit submitted by plaintiff, in which he appears to walk back some of his deposition testimony on this issue by re-iterating the facts stated in his complaint. However, this court is not basing its order today upon plaintiff's request to be transferred, and it has not relied upon his affidavit in making its ruling today. Defendant's motion to strike will therefore be dismissed as moot.

bar ADA claims which are themselves based upon an argument that defendant's failure to accommodate his disability was the reason for his absences. This court therefore concludes that genuine fact issues exist regarding each element of plaintiff's burden of proof on his ADA claim, and defendant's motion to dismiss that claim will therefore be denied.

This court now turns to claims asserted by plaintiff in connection with his allegation that he was racially and sexually harassed and discriminated against while working at the jail. Most of these claims require, on summary judgment, the application of some version of the familiar *McDonnell Douglass* burden-shifting framework, but, in the interests of brevity, this court will simply cite the version of that test which is applicable to the retaliation claim which it regards as plaintiff's potentially strongest claim. To establish a prima facie case of retaliation, a plaintiff must show "'(1) he participated in an activity protected by Title VII [or the ADA]; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action.'" *Dinolfo v. Home Depot U.S.A., Inc.*, 2018 U.S. Dist. LEXIS 51324, at *4 (N.D. Miss. March 28, 2018) (quoting *Stringer v. Mound Bayou Public School District*, 2016 U.S. Dist. LEXIS 5530, 2016 WL 183701, *13 (N.D. Miss. Jan. 14, 2016)). Once a plaintiff makes such a *prima facie* case, the defendant is required to present a legitimate, non-retaliatory reason for firing him, which the plaintiff may seek to rebut by offering evidence of pretext. *Id.* In order to ultimately prevail in a retaliation claim, the plaintiff must show that the protected conduct was a "but for" cause of the adverse employment action. *Bernofsky v. Administrators of the Tulane Educ. Fund*, 2000 U.S. Dist. LEXIS 5561, at * 15 (E.D. La. Apr. 18, 2000) (citing *Scrivner v. Socorro Independent School District*, 169 F.3d 969 (5th Cir. 1999)).

Plaintiff's racial and sexual harassment claims require the application of somewhat different legal standards. "A plaintiff may establish a Title VII violation based on race creating a hostile work environment." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). In determining whether a workplace constitutes a hostile work environment, courts must consider the following circumstances: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Walker v. Thompson*, 214 F.3d 615, 525 (5th Cir. 2000)). In order to survive summary judgment on a hostile working environment claim, the plaintiff must produce evidence that would create a genuine issue of material fact for each of the following elements:

(1) he belongs to a protected group;
(2) he was subjected to unwelcome harassment;
(3) the harassment complained of was based on race or gender;
(4) the harassment complained of affected a term, condition, or privilege of employment;
(5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Id.* (*citing Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001); *Jones v. Flagship Int'l*, 793 F.2d 714, 719-20 (5th Cir. 1986)).

In this case, it seems clear that plaintiff's retaliation claims are closely intertwined with his claims that he was discriminated against and harassed on the basis of his race and/or sex. These claims are described in his brief as follows:

Scotty Clark, white, was the jail administrator. Clark hired Tyler Stanford, white, as the assistant jail administrator shortly after Clark became the jail administrator. Hankins, white, the person who was supposed to train Simmons, did not properly train Simmons. Simmons complained to Clark, but Clark never did anything about it. Instead of training Simmons like Hankins was supposed to do, he harassed Simmons with racial and sexual slurs. Hankins would repeatedly call Simmons, "Urkel, the black nerd." Hankins would

call Simmons a "faggot." Simmons would tell Hankins to stop calling him by these slurs, but Hankins would not stop. Because of the abuse that Hankins was inflicting, a trustee, Robert Tanner Young, would call Simmons by these same racial and sexual slurs. Simmons reported the harassment to the jail administrator, Scotty Clark, on several occasions. Simmons reported the race and sex harassment to Clark three (3) times in January 2018, and twice in February 2018. Clark admitted that he never investigated whether Simmons has been subjected to race or sex harassment.

[Plaintiff's brief at 22-23].

In his deposition, plaintiff testified that:

Q. So I believe you're claiming in your lawsuit that Davis Hankins harassed you. What do you mean by that?
A. Well, he was going around calling me Steve Urkel, the black nerd, and calling me a faggot, which I'm not. And, you know, I kind of find that as harassment.
Q. Okay. Did you tell your superior officer about this?
A. Yes, ma'am.
Q. And who did you tell?
A. Mr. Scotty Clark.
Q. Okay. And when did you tell him?
A. I told him -- it was like around the middle of December or right at the end of December.

[Depo. at 21]. Plaintiff later testified as follows:

Q. Okay. So who else, if anyone, heard Davis Hankins saying these things that you allege he said?
A. Well, I know Sandy Livingston, she heard. Sandy Livingston.
Q. What did she hear him say?
A. When he called me a faggot.
Q. Okay. Did you -- when he would call you these things, what would you say to him?
A. Well, I would tell him to stop calling me that and he kept on doing it.
Q. Did anybody besides Sandy hear him say these things?
A. Yes. One of the trustees, his name was Robert Tanner Young.
Q. What do you think he heard him say?
A. He was calling me a faggot and Steve Urkel, the black nerd. And he would go and do the same thing as Davis was doing.

[Depo. at 22].

Plaintiff contends that he again reported the harassment to his supervisor Clark immediately before he was forced out of his job. In his deposition, plaintiff described Clark's reaction to his report of harassment as follows:

> Well, he -- when I got there that morning, [Clark] told me that he was mad that I wasn't there because I was going to the doctor back and forth. And I had told him that the smoke was making me sick and that's the reason I had to take off. And if it wasn't for that, you know, I would be -- I wouldn't have to take off every day. And he kind of got angry, upset and was like, well, you ought to be here. You ought to be here. And I kept explaining to him and I kept -- and I told him about the harassment again, how they was calling me Steve Urkel, the black nerd, and they were calling me a faggot. And he was like, well, I'm not going to do anything about. You tell them. I'm like, well, sir, you're the jail administrator. That's your job to stop this stuff. And I come to you and report it, you're supposed to stop it. I really -- I can't do nothing about it unless you do something. And so he went on and terminated me then. He told me to take a sheet of paper and write down that I resigned, even though I didn't resign, I was really terminated.

[Simmons depo. at 69].[4] Plaintiff thus testified that he informed his supervisor both of his ADA-based and race/sex discrimination claims immediately before he was fired.

If believed by a jury, plaintiff's testimony is quite arguably suggestive of unlawful retaliation for "opposing" racial/sexual harassment under Title VII and/or disability discrimination under the ADA. Indeed, plaintiff testified that, when he reported the harassment to Clark, he not only refused to do anything about it, but forced him out of his job for reporting it. In his own deposition, Clark appeared to concede that plaintiff did, in fact, raise the issue of being called names on the day he "resigned," although Clark characterized Simmons' complaints in different terms than plaintiff did:

> Q. Did Mr. Simmons ever complain to you about race or -- race discrimination?
> A. No, he did not. On the -- he said something about being, he thought some people were picking at him, and that was the day of the resignation. But before that, no.
> Q. Did you ask him what do you mean picking on him?
> A. He said calling him names.
> Q. Did you ask what names they were calling him?
> A. No, I did not.
> Q. Didn't you want to know?
> A. He had already placed his resignation at that time, so I didn't feel there was no need to pursue it any further.
> Q. Did he ever complain about being called a homosexual or a faggot?
> A. No, he did not, not to me.

---

[4] As noted previously, defendant itself concedes that plaintiff was fired, and it thus seems clear that the parties agree on this one limited point.

[Clark depo. at 10].

In the court's view, Clark's testimony may be regarded by a jury as somewhat helpful to plaintiff's retaliation claims, since it appears to reduce the possibility that Simmons is simply making up his allegations out of whole cloth. Certainly, Clark's testimony provides plaintiff with a quite strong temporal proximity argument, inasmuch as he appeared to concede in his deposition that a complaint of some sort of harassment was made on the very same day he was fired. This is significant, since "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. General Services Admin.,* 110 F.3d 1180, 1188 (5th Cir. 1997) (*citing Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).

In its brief, defendant appears to characterize plaintiff as having reported the harassment only after he was fired, but, as discussed below, Simmons disputes this characterization. In seeking dismissal of plaintiff's retaliation claim, defendant argues in its brief as follows:

> In this case, Mr. Simmons cannot establish a prima facie case of retaliation because he did not participate in an activity protected under Title VII or the ADA. Title VII "prohibits discrimination against an employee on the ground that 'he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Id.* at *3-*4 (quoting 42 U.S.C. § 2000e-3(a)). Similarly, the ADA provides that "'[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Id.* at 4 (quoting 42 U.S.C. § 12203). Mr. Simmons did not file a charge with the EEOC until February 8, 2018, one day after his termination. Additionally, at the very most, Mr. Simmons notified his employers that (1) employees were smoking inside the jail prior to his termination and (2) Mr. Hankins was calling him names *after* he was terminated. As such, Mr. Simmons never participated in any protected activity under the ADA or Title VII. Mr. Simmons retaliation claim should be dismissed.

[Defendant's brief at 19].

In the court's view, defendant's arguments are, at best, incomplete since they only address plaintiff's "participation" clause claims and not the "opposition" clause claims which this court regards as constituting his main (and likely only viable) retaliation claim. Title VII "prohibits discrimination against an employee on the ground that 'he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" 42 U.S.C. § 2000e-3(a)). The ADA has a similar provision. *See* 42 U.S.C.A. § 12203. In alleging that he reported alleged racial and sexual harassment and disability discrimination to Clark immediately before he was fired, plaintiff is clearly alleging an "opposition" clause claim, and the U.S. Supreme Court has interpreted this clause in a manner which is rather favorable to plaintiffs. *See, e.g. Crawford v. Nashville,* 555 U.S. 271 (2009).

By focusing so heavily upon plaintiff's participation clause claims, defendant seems hesitant to address the merits of the opposition clause claim. In its reply brief, defendant argues that plaintiff only made his report *after* he resigned to Clark, but, once again, Simmons disputes this characterization. To reiterate, plaintiff testified in his deposition that:

> I told him about the harassment again, how they was calling me a Steve Urkel, the black nerd, and they were calling me a faggot. And he was like . . . I'm not going to do anything about it. You tell them. I'm like, well, sir, you're the jail administrator. That's your job to stop this stuff. And I come to you and report it, you're supposed to stop it. . . . I can't do nothing about it unless you do something. And so he went on and terminated me then. He told me to take a sheet of paper and write down that I resigned, even though I didn't resign, I was really terminated.

[Simmons depo. at 69]. As noted previously, defendant now agrees with plaintiff that he was fired, and this serves, in the court's view, to cast some doubt upon Clark's version of events. In the court's view, the fact that Clark testified that he relied upon what the parties now agree was a non-genuine resignation in deciding not to investigate plaintiff's allegations of harassment

strikes this court as potentially problematic for defendant's defense of this case. This court notes parenthetically that, even under Clark's version of the facts, plaintiff may have a legitimate argument that defendant should have handled his complaint differently. As quoted above, Clark testified that he did not feel obligated to investigate plaintiff's complaint of harassment since he had already indicated his intent to resign. [Clark depo. at 10]. However, plaintiff would appear to have a legitimate argument that, if an employee expresses an intent to resign, and then cites harassment as contributing to that decision, the appropriate response would be to assure the employee that harassment would not be tolerated and that he should not resign on the basis of same.

In its reply brief, defendant appears to offer internally inconsistent arguments regarding the summary judgment evidence on the issue of timing. Specifically, defendant writes in its reply brief that:

> Plaintiff argues that he reported both the race and sex harassment to Mr. Clark on several occasions prior to his termination. . . . Mr. Simmons did not file a charge with the EEOC until February 8, 2018, one day after his termination. Additionally, at the very most, Mr. Simmons notified his employers that (1) employees were smoking inside the jail prior to his termination and (2) Mr. Hankins was calling him names *after* he was terminated. As such, Mr. Simmons never participated in any protected activity under the ADA or Title VII. Mr. Simmons' retaliation claim should be dismissed.

[Reply brief at 21]. Defendant thus concedes, on the one hand, that plaintiff alleges that he reported the harassment to Clark "on several occasions prior to his termination," yet it maintains shortly thereafter that "at the very most . . . Mr. Hankins was calling him names *after* he was terminated." [Id.] Defendant's argument appears to assume that plaintiff's participation clause claim was his only retaliation claim, but, as discussed above, that is clearly not the case. Indeed, this court is inclined to allow a jury to decide *only* plaintiff's opposition clause claim in this case, unless the evidence at trial demonstrates some basis for asserting a participation clause claim. At

the same time, this court does not regard defendant's summary judgment briefing as seriously contesting plaintiff's opposition clause claim.

Defendant does appear to have at least potentially a strong jury argument that, in light of plaintiff's excessive absences, it had a valid non-discriminatory reason to fire him, regardless of any alleged retaliation. At the same time, this argument is, to some extent, dependent upon the success of defendant's defense to plaintiff's ADA claims, since plaintiff contends that many of his absences were the result of its failure to enforce its anti-smoking policy, and, thus, accommodate his disability. Moreover, given the very strong temporal proximity evidence in this case, a jury might conclude that defendant's stated reason for firing plaintiff is merely pretextual and that retaliation for reporting harassment was the real reason. This court can thus discern multiple triable fact issues relating to plaintiff's opposition clause-based retaliation claim, and defendant's motion for summary judgment will therefore be denied on this claim.

This court now turns to plaintiff's remaining race-based claims, which are heavily intertwined with his retaliation claims. In light of this close factual connection, this court's consideration of whether summary judgment is the best context for addressing the remaining claims is heavily influenced by judicial economy concerns. Indeed, as a result of this court's rulings today, the jury – and this court - will already be hearing evidence at trial relating to plaintiff's allegation that he was racially and sexually harassed at work. That being the case, this court can discern little advantage to pre-judging, on summary judgment, the issue of whether the name-calling which defendant (partially) concedes actually took place at the jail was sufficiently "severe or pervasive" to constitute actionable harassment under Title VII.

This court will be in a better position to evaluate defendant's arguments in this context on a motion for directed verdict, and, even then, there are judicial economy considerations which

support allowing a jury to make a finding on this issue. Indeed, if this court were to dismiss plaintiff's harassment claims as a matter of law, and the Fifth Circuit were to conclude that it erred in doing so, then a new trial would be required, with all the time and expense which that entails. If, on the other hand, a jury were to find in favor of plaintiff on his harassment claims, and the Fifth Circuit were to conclude that it lacked a basis for doing so, then it could simply vacate the jury's award and render judgment in favor of defendant, with no re-trial required. This court can thus discern strong judicial economy considerations against resolving this issue on summary judgment.

This court does agree that there are reasonable questions as to whether calling someone the "black Urkel"[5] or "the black nerd," even on a repeated basis, is the sort of extreme conduct which Title VII harassment claims were designed to address. Plaintiff's allegation that he was repeatedly called a "faggot" appears to present a closer call in this regard. At any rate, this is the kind of issue which jurors can easily assess for themselves, after they have been fully instructed regarding the stringent legal standards which apply in this context. This court notes that, in disputing that the name-calling directed at Simmons was simply harmless fun, plaintiff has submitted an affidavit from Carolyn Walker, an inmate at the jail. In her affidavit, Walker states that:

> After Robert Simmons was terminated I asked Davis Hawkins where Robert Simmons was and he said that Steve Urkel, the nerd, was gone because he was "too sweet" meaning that he was claiming that Simmons was gay.

[Walker affidavit at 1]. In the court's view, assessing evidence of this nature is a function which a jury is uniquely well-suited to perform, and it intends to allow plaintiff to present any admissible evidence in this regard at trial. This court will therefore decline to dismiss plaintiff's

---

[5] No party appears to dispute that the fictional character "Steve Urkel," from the sitcom "Family Matters" was portrayed in the series as a "nerdy" African-American individual.

race and sexual harassment claims on summary judgment, and it will consider the parties' arguments as to whether it should do so on directed verdict after the presentation of the evidence at trial.

This court now turns to plaintiff's claims of race discrimination relating to his firing. While this court certainly regards plaintiff's circumstantial proof of race discrimination as being less compelling than his proof of retaliation, it is also true that a more forgiving "motivating factor" burden of proof applies in the Title VII discrimination context. *See University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013)(holding that a "but for" causation standard applies to Title VII retaliation claims but not discrimination claims.). Moreover, plaintiff notes in his brief that, before he was fired, he was the only African-American out of sixteen jailers at the facility and that he was replaced by a white male. These circumstantial factors, considered in light of plaintiff's proof that defendant showed little interest in addressing the reports of racial harassment he made, appear to provide him with at least a colorable jury argument that his race was a motivating factor in his termination.

These factors aside, plaintiff points out in his brief that defendant has failed to seek summary judgment as to his 42 U.S.C. § 1981 claims, which largely duplicate the race discrimination provisions of Title VII, but with a more generous scheme of damages. In light of this fact, this court would quite arguably lack the discretion to completely dismiss plaintiff's race discrimination claims on summary judgment, even if it concluded that he has failed to present any circumstantial proof of discrimination at all. This court will, however, grant defendant's motion for summary judgment with regard to one specific claim, namely plaintiff's 42 U.S.C. § 1983 claims for race discrimination. As to this claim, this court agrees with defendant that plaintiff has failed to present proof that he was discriminated against under circumstances which

might give rise to municipal liability under the Supreme Court's decision in *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978). Indeed, plaintiff has failed to even address

defendant's arguments in this context in his response to the summary judgment motion, and it

therefore appears that these arguments are conceded. This court will therefore grant defendant's

motion for summary judgment as to plaintiff's § 1983 claims, but it will deny that motion as to

its remaining claims.

While this court has given plaintiff significant benefits of the doubt in this order, it

wishes to be clear that defendant has raised very real questions regarding his credibility in its

summary judgment briefing. The fact that this court has concluded that a jury should make these

credibility assessments should not be understood as an indication that it is unaware that they

exist. For example, this court intends to allow the jury to hear evidence at trial that plaintiff

previously filed a lawsuit against his former employer Walmart arising from allegations that he

was harassed by being called a black "nerd" and a "faggot." In its brief, defendant writes that:

> We note that Mr. Simmons has filed a *very* similar lawsuit previously that ended in a
> confidential settlement. Exhibit A, Deposition of Robert Earl Simmons, Jr., P5, L12-17;
> P6,
> L22-25; P7, L1-9.
> Ms. Griffith: So you were suing somebody else?
> Mr. Simmons: Walmart. It was a few years ago.
> Q: Why did you sue Walmart?
> A: Race and sexual harassment.
> ***
> Q: So in that case, who were you alleging discriminated against you?
> A: It was some of the coworkers.
> Q: Were they white?
> A: Yes.
> Q: What did they do to you?
> A: They was making inappropriate comments, like calling me a faggot, calling me a
> nerd.
> Q: So you're saying that has happened by my client, Monroe County?
> A: Yes.

[Defendant's brief at 2, n. 3].

This court agrees with defendant that it is a remarkable coincidence that plaintiff has filed two lawsuits containing such similar allegations, and it suspects that jurors may agree. This court believes that jurors may be particularly skeptical of the fact that, after suing his previous employer for allegations very similar to those in this case, plaintiff allegedly found himself the victim of race, sex and disability discrimination almost immediately after starting work at the Monroe County jail. This court notes that, while it is allowing plaintiff to present allegations regarding multiple theories of liability to the jury in this case, this fact may ultimately work against him at trial. In this court's experience, when a plaintiff asserts multiple theories of liability at a single trial, it often results in those theories competing against each other and harming the plaintiff's credibility in the eyes of the jury. In allowing plaintiff to present evidence regarding essentially all his claims at trial, this court is partly motivated by a belief that, since his credibility will likely be the central issue in this case, it is appropriate that jurors hear evidence regarding each and every allegation of discrimination and retaliation which he alleges he suffered during his very brief tenure at the Monroe County jail.

This court suspects that jurors *may* harbor reservations that plaintiff is an overly sensitive and litigious individual or, even worse, a savvy and cynical abuser of federal discrimination and retaliation laws. On the other hand, jurors may regard plaintiff's testimony as entirely credible and conclude that his allegation that he has repeatedly been subjected to similar forms of harassment is truthful. Indeed, it should be emphasized that defendant concedes that plaintiff actually was called "Urkel" by his co-worker, which tends to reduce any suspicion that he has completely manufactured his claims in this case. Clearly, this is a case which depends heavily upon plaintiff's credibility, in particular his testimony of what he told his employer about his alleged disability and harassment. This court is simply not in a position to declare that plaintiff

is being untruthful about these matters, and it will therefore leave it to a jury to make these assessments.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is granted with regard to plaintiff's § 1983 claims, but it is denied with regard to his remaining claims. Defendant's motion to strike is dismissed as moot.

SO ORDERED, this the 21st day of November, 2019.


/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE